UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Surya Nallani,

       Plaintiff,

v.                                                                Case No. 14-12918

Wayne County, *et al.*,                                Sean F. Cox
                                                                  United States District Court Judge

       Defendants.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

     Surya Nallani ("Plaintiff") brought this § 1983 action on behalf of herself and the estate of her deceased husband, asserting claims against seven named Defendants: 1) Wayne County; 2) Sheriff Benny Napoleon; 3) Jason Case, a deputy officer at the Wayne County Jail; 4) William Covington, corporal officer at the Wayne County Jail; 5) Hisham Hammoud, a deputy officer at the Wayne County Jail; 6) Steve Hunter, a deputy officer at the Wayne County Jail; and 7) Faye Zuhairy, a licensed psychiatrist with the Wayne County Jail. Plaintiff also asserts a state-law claim for gross negligence. Plaintiff's claims arise out of the suicide death of Srinivas Nallani while he was an inmate at the Wayne County Jail.

     The matter is currently before the Court on the Defendants' Motion for Summary Judgment. The parties have fully briefed the issues and the Court heard oral argument on October 29, 2015. For the reasons set forth below, the Court shall GRANT summary judgment in favor of Defendants as to all three counts of Plaintiff's Complaint.

1

## BACKGROUND

Plaintiff filed this action on July 25, 2014.  Plaintiff's original Complaint named the County of Wayne ("County"), Sheriff Travis Hutchinson ("Hutchinson"), Deputy Steve Hunter ("Hunter"), Deputy Hammoud ("Hammoud"), and Faye Zuhairy ("Zuhairy") as defendants. (Docket Entry No. 1).

On August 1, 2014, Plaintiff filed an Amended Complaint, which dropped its claims against Hutchinson and, instead, named Sheriff Benny Napoleon ("Napoleon").  (Docket Entry No. 7).

On February 3, 2015, after leave from the Court, Plaintiff filed a Second Amended Complaint, wherein Deputy Jason Case ("Case") and Corporal William Covington ("Covington") were added as defendants.  (Docket Entry No. 20).

Plaintiff's Second Amended Complaint is the operative complaint in this action and it asserts the following three counts:

1)    "Denial of Medical Treatment - For Serious Medical Needs - Deliberate Indifference" against all Defendants (Count I);

2)    "Failure to Train, Inadequate Policies and/or Procedures, Customs and Practices and Failure to Supervise - Deliberate Indifference" against County and Napoleon (Count II); and

3)    "Gross Negligence, Intentional, Willful and Wanton Conduct" against all Defendants (Count III).

(Sec. Am. Compl.).

Following the close of discovery, Defendants filed the instant Motion for Summary Judgment. (Docket Entry No. 28).

2

This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56(c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Docket Entry No. 17). Defendants complied with the Court's practice guidelines for motions for summary judgment such that their motion includes a "Statement of Material Facts Not In Dispute" (Docket Entry No. 28 at Pg ID 159-62, "Defs.' Stmt."). Plaintiff's response brief includes a "Response to Defendant's Statement of Undisputed Material Facts" (Docket Entry No. 35 at Pg ID 508-23, "Pl.'s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, taken in the light most favorable to Plaintiff, the nonmoving party.

## A.    Nallani's Evaluations and Testimony

On May 31, 2013, Srinivas Nallani ("Nallani") was brought to the Wayne County Jail by U.S. Marshals after being arrested for making a misrepresentation on a gun purchase application. (Pl.'s Stmt. ¶¶ 1-2; Defs.' Stmt. ¶¶ 1-2). At the time, both Plaintiff and Nallani were under indictment for Medicare fraud charges. (Pl.'s Stmt. ¶ 2; Defs.' Stmt. ¶ 2). During the booking

3

process, an initial screening noted that Nallani reported a history of ADHD, depression, and anxiety. (Ex. A to Pl.'s Resp.). Nallani's responses elicited additional screening by the Jail mental health staff. (Pl.'s Stmt. ¶ 6; Defs.' Stmt. ¶ 6). Thus, at 6:45 p.m. on that same day, Nallani was evaluated by social worker Gayle Hatfield ("Hatfield"). (Pl.'s Stmt. ¶ 7; Defs.' Stmt. ¶ 7).

### 1. Hatfield's May 31, 2013, Evaluation

Hatfield's evaluation yielded the following information. Nallani began seeing a psychiatrist in 2011, but had not been treated for 3-4 months because he no longer had insurance and his psychiatrist retired. (Ex. A to Pl.'s Resp. at 4). Nallani indicated that he was prescribed Adderall and other medications for anxiety, depression and sleep, all of which he had not taken for 3-4 months. *Id.* Although Nallani denied any current homicidal or suicidal ideation, he admitted to hurting himself when he was 10 years old. *Id.* At the time of the evaluation, Nallani was 48 years old. *Id.* Nallani also admitted that he was feeling suicidal when he was arrested, but maintained that he did not feel that way at the time of the evaluation. *Id.* Nallani indicated that he felt extremely depressed and described hearing voices tell him he was causing trouble to his family. *Id.* Hatfield observed Nallani to be unstable and reporting symptoms consistent with panic attacks. *Id.* Hatfield diagnosed Nallani with major depressive disorder and anxiety disorder. *Id.* Accordingly, Hatfield referred Nallani for admission to the Mental Health Unit ("MHU") and he was assigned to the 4th floor. (Pl.'s Stmt. ¶ 8; Defs.' Stmt. ¶ 8). The 4th floor of Wayne County Jail Division 1 is dedicated to mental health inmates. Nallani was housed in 4 southeast cell 13 ("4SE13"). (Pl.'s Stmt. ¶ 11; Defs.' Stmt. ¶ 11).

4

### 2.      Tuitt's May 31, 2013, Evaluation

At 9 p.m. that same evening, Nallani was evaluated by Nurse Bernadine Tuitt ("Tuitt"). (Pl.'s Stmt. ¶ 10; Defs.' Stmt. ¶ 10).  Nallani stated that he suffered from ADHD and depression, but denied suicidal and homicidal ideation.  (Ex. A to Pl.'s Resp. at 5).  Tuitt's stated goal and objective was to monitor Nallani closely.  *Id.*

### 3.      Judge Whalen's June 3, 2013, Observations

On June 3, 2013, Nallani appeared before United States Magistrate Judge Steven Whalen for a detention hearing on the underlying gun charges. (Pl.'s Stmt. ¶ 12; Defs.' Stmt. ¶ 12). At the hearing, Nallani was ordered detained pending trial. (Pl.'s Stmt. ¶ 12). During the hearing, Nallani's defense counsel stated on the record that he believed Nallani purchased the gun with the intent to harm himself. (Ex. C to Pl.'s Resp. at 10).  Upon ordering Nallani to remain in custody, Judge Whalen noted that Nallani "clearly" needed  mental health treatment.  *Id.* at 13. Judge Whalen concluded that if "[he] were to grant bond in this case, there is nothing that reasonably assures [him] that [Nallani] is not going to present a danger to himself or others."  *Id.* at 14.

No evidence in the record suggests that any of the Defendants were made aware of Judge Whalen's order or his observations of Nallani.

### 4.      Witulski's June 4, 2013, Evaluation

On June 4, 2013, psychologist Lisa Witulski ("Witulski") evaluated Nallani at the Wayne County Jail.  (Pl.'s Stmt. ¶ 13, Defs.' Stmt. ¶ 13).  Witulski's evaluation revealed that Nallani was suffering from paranoid "fixed delusions" regarding being "set up" by the FBI.  (Ex. A to Pl.'s Resp. at 6).  Nallani indicated that he suffered from ADHD, depression and was having

"terrible" trouble sleeping. *Id.* Witulski diagnosed Nallani with mood disorder and psychotic

disorder. *Id.* Per Witulski's notes, Nallani was to be evaluated by a psychiatrist on June 5, 2013.

*Id.* A follow-up evaluation was scheduled for June 11, 2013. *Id.*

###### 5.    Defendant Zuhairy's June 5, 2013, Evaluation

On June 5, 2013, Nallani was evaluated by Defendant Zuhairy, a psychiatrist at the jail.

(Pl.'s Stmt. ¶ 14, Defs.' Stmt. ¶ 14).  Zuhairy testified that prior to the evaluation, the notes

generated from Nallani's initial screening and from Hatfield and Witulski's evaluations were

available to her.  (Ex. F to Pl.'s Resp. at 27-28, "Zuhairy's Dep.").  Although Zuhairy does not

specifically recall reviewing Nallani's notes, she testified that it was routine for her to do so.  *Id.*

Zuhairy's primary objective was to ascertain whether or not Nallani posed a risk to himself.  *Id.*

at 102-03.  In making this determination, Zuhairy considers all medical notes in Nallani's file

including Hatfield and Witulski's evaluations.  *Id.* at 109.  Zuhairy would have additionally

considered Judge Whalen's order, but it was not made available to her.  *Id.* at 47-49.

During the evaluation, Nallani claimed that he had "been set up" on the underlying gun

charges.  *Id.*  Nallani revealed that he was on the MHU floor because his "lawyer didn't shut his

mouth up and said he was scared [Nallani] was trying to buy the gun to shoot [himself]."  (Ex. A

to Pl.'s Resp. at 7).  Zuhairy was aware that Nallani was arrested for purchasing a gun and that

concerned her "because a gun is access to means."  (Ex. F to Pl.'s Resp. at 96, "Zuhairy's Dep.").

Nallani denied buying the gun for that reason and denied having thoughts of wanting to hurt

himself.  (Ex. A to Pl.'s Resp. at 7)*.*  Zuhairy admitted that these statements were inconsistent

with the information she had read in Nallani's previous medical notes, where Nallani admitted to

feeling suicidal at the time of his arrest.  (Zuhairy's Dep. at 99).  Zuhairy testified that a change

or difference in evaluations of an inmate is something to note because the "patient can actually be

fluctuating in their symptoms" and this would be cause for concern.  *Id.* at 91-92.   She testified:

> **Q**:   If you have an inmate whose fluctuating in their symptoms does that raise any
> concern to you as a psychiatrist?
>
> **A**:   Yes.
>
> **Q**:   Why?
>
> **A**:   It could mean that the patient themselves are inconsistent with what they are
> reporting, it could mean that they are minimizing their symptoms, it could mean
> they are embellishing their symptoms, it could mean they are stable more
> medically than psychiatrically. If someone is floridly psychotic it doesn't just go
> away for a couple of days without medication.

*Id.* Despite this cause for concern, Zuhairy failed to investigate the differences by following up

with either Witulski or Hatfield.  *Id.* at 135.

When determining whether or not an inmate poses a threat to himself thereby requiring

continuous observation, Zuhairy testified to the following:

> **Q**:   Are there certain signs or symptoms that you're looking for as you conduct your
> evaluation about whether or not they should go into continuous observation?
>
> **A**:   Absolutely. There's a long list, but for example, previous suicide attempt,
> previous thoughts of wanting to hurt themselves, current thoughts of wanting to
> hurt themselves, whether or not they use substances, whether, you know, there's
> been studies that show Caucasian males over the age of 55 are higher risk,
> whether they have support or not, and obviously their circumstance, whether they
> have psychotic symptoms, some of which might be voices that tell them to hurt
> themselves and whether they have access to means.

*Id.* at 57.  Zuhairy observed that Nallani was depressed and testified that depression is a risk

factor for suicide.  *Id.* at 71.  Zuhairy testified that the hallucinations reported in Hatfield's notes

are of concern to her "because that can increase the... suicide risk."  *Id.* at 72.  Additionally,

Nallani's previous psychiatric history, his suicidal thoughts at the time of his arrest, and his

trouble sleeping are all factors to consider when Zuhairy makes her determination. *Id*. at 69, 80, 89. According to Zuhairy, a patient's denial of suicidal ideation is but one factor to consider when diagnosing a patient with suicidal behavior. *Id.* at 58. In the past, Zuhairy has placed inmates on continuous observation despite their denial of current suicidal thoughts. *Id.* at 59. Zuhairy testified that, based on Hatfield's observations, Hatfield was correct in diagnosing Nallani with Major Depressive Disorder. *Id.* at 73-74. Zuhairy additionally testified that, based on Witulski observing Nallani's paranoia, she agreed with Witulski's diagnosis of Mood Disorder and Psychotic Disorder. *Id.* at 84.

Zuhairy's recommendation appears to have been made based on her own observations of Nallani. Zuhairy ultimately diagnosed Nallani with adjustment disorder and ADHD and prescribed Zoloft because of his history of depression and Trazadone for insomnia. (Ex. G to Defs.' Motion at 107; 105). Zuhairy admitted that anti-depressants such as Zoloft generally take up to three weeks to take full effect. (Zuhairy's Dep. at 31). Zuhairy recommended Nallani's return to general population with continued mental health follow-ups. *Id.* at 108. Despite Zuhairy's recommendation, Nallani remained on the mental health floor up until his death (Pl.'s Stmt. ¶ 15; Defs.' Stmt. ¶ 15), but he was never placed under continuous observation.

### 6.    Plaintiff's Experts' Reports re: Nallani's Mental Health

The record includes reports from two of Plaintiff's experts regarding the insufficiency of Zuhairy's treatment and detection of Nallani's suicide risk.

Larry Kirstein, M.D. notes the findings in Hatfield and Witulski's reports and concludes that Nallani's psychiatric medical need was obvious from the time he was admitted to the jail. (Ex. D to Pl.'s Resp., "Kirstein's Report"). Based on Nallani's needs, Zuhairy was required to

8

maintain mental health housing for him in an area that is closely monitored and in full view of the custody staff.  *Id.* at 4.  Kirstein's report states that Zuhairy failed to recognize and treat Nallani's suicide symptoms. *Id.* at 5.

Thomas W. White, Ph.D. discusses, among other things, the insufficiency of Zuhairy's evaluation.  White points out that while Hatfield and Witulski's evaluations reflect findings that are much more indicative of serious mental illness, all of which are more associated with suicide, Zuhairy's report references none of the serious behaviors in the previous reports.  (Ex. N to Pl.'s Resp. at 9).  White concludes that it was clear that Nallani suffered from serious mental illness and a "tenuous grasp on reality, exhibiting paranoid thinking, hallucinations and periodic thoughts of suicide."  *Id.* at 13.  It is White's opinion that Zuhairy exhibited negligence when failing to properly assess Nallani and in doing so, Zuhairy did not recognize or adequately respond to his risk of suicide.  *Id.* at 15.

### 7.    Testimony of Mental Health Department Administrator re: Zuhairy's Evaluation

John Restum, WCJ's  Mental Health Department Administrator, testified that differences between evaluations is not uncommon given that each evaluator is getting different presentations as time goes on.  (Ex. C to Defs.' Motion at 136, "Restum's Dep").  Restum additionally testified that based on his review of the record, Nallani was not a candidate for continuous observation since there were no relevant signs or symptoms.  *Id.* at 153.

### 8.      Nallani's Grievance Form

Nallani also completed a jail grievance form on June 6, 2013, that referenced the jail's

failure to secure for him the proper medical treatment and medication.[1]  (Ex. G to Pl.'s Resp.).

Nallani complained that it took five days for him to see a psychiatrist and that the guards were

unresponsive to his needs.  *Id.*  Nallani concluded his grievance by writing that "no one care[d]."

*Id.*  The grievance was received by two jail employees on June 10, 2013.  *Id.*  There is no

indication that any of the mental health staff were aware of these complaints.

### B.      Deputy Defendants' Testimony re: Events Leading Up To Nallani's Death

On the evening of June 10, 2013, Defendants Hunter and Case were working the

midnight shift on the 4th floor of the Wayne County Jail.  (Pl.'s Stmt. ¶ 24, 26; Defs.' Stmt. ¶ 24,

26).  The shift began at 11 p.m. and ended at 7 a.m. the following morning.  *Id.*  Defendant Case

was the Rover on duty for the midnight shift that night and conducted the first round and the card

count.  (Pl.'s Stmt. ¶ 26, Defs.' Stmt. ¶ 26).  Defendant Case explained that during a card count,

he  is required to match each inmate card with the inmates in each cell by going to each

individual cell and calling each inmate's name.  (Ex. B to Pl.'s Resp. at 15-16, "Case's Dep.").

Inmates can be identified either by the picture on the card, the information on their wristband or

the picture on the computer. *Id.* at 16.   Nallani's card did not contain his picture, so Case was

required to match the information on the card with Nallani's wristband.  However, at no point

during his round did Defendant Case match the information to Nallani's wristband.  According to

Case, he is also required to elicit a response from the inmates as part of his round.  *Id.*  During his

card count on June 10, 2013, Defendant Case observed Nallani sitting up on his bunk with his

---

[1] Nallani began receiving his psychotropic medication on June 6, 2013 and every day thereafter.
(Pl.'s Stmt. ¶ 17; Defs.' Stmt. ¶ 17).

back against the wall. *Id.* at 17. Nallani was allegedly covered in a blanket from the shoulders down. *Id.* When Nallani's name was called, Case recalls Nallani lifting his hand underneath the blanket, but he does not recall Nallani giving an audible response of any sort. *Id.* at 17, 19. This concluded the first round and card count and it was the last time Nallani was seen awake. (Pl.'s Stmt. of Add'l Facts ¶ 13). The record shows that Defendant Case spent approximately 27 seconds to complete the round. (Ex. H to Pl.'s Resp. at 49-50, "Hunter's Dep.").

After the 11 p.m. card count, Nallani and the other inmates on the Mental Health Unit were on lock down throughout the night with the lights off. (Hunter's Dep. at 32). During that period, security rounds were to be completed every 30 minutes. *Id.* at 54. Ten cells, numbered 7 through 16, were subject to these security rounds. *Id.* Defendant Case conducted half-hour rounds for the next two hours, during which he observed Nallani laying on his side, facing the wall with a blanket over him. (Case's Dep. at 20, 26). According to Case, it was common for inmates to sleep with blankets over their heads during the midnight shift. *Id*. at 52.

Defendant Hunter was the next deputy to conduct rounds on the MHU floor. (Hunter's Dep. at 55). His half-hour rounds started at 3 a.m. and ended at 5 a.m. *Id.* During his rounds, Defendant Hunter recalls Nallani being asleep and does not recall whether or not a blanket was covering his head at the time. *Id.* at 35.

The next shift started at 7 a.m. on June 11, 2013. (Pl.'s Stmt. of Add'l Facts ¶ 18). Defendants Hammoud and Covington assumed responsibilities on the ward. Defendant Covington was responsible for conducting the 7 a.m. card count. At the time in question, Defendant Covington was aware of the card count policy requiring visualization of and responses from the inmates. (Ex. J to Pl.'s Resp. at 31, "Covington's Dep."). During his card count,

11

Defendant Covington admitted to never having seen Nallani's face. *Id.* at 30. Defendant

Covington does not recall eliciting any sort of response, audible or not, from Nallani. *Id.*

Because Nallani's identification card did not have his picture on it, Defendant Covington was

required to match Nallani's wristband to the card to ensure the right inmate was in the cell. *Id.* at

31-32. Defendant Covington failed to do this despite knowing that it was required by policy. *Id.*

Instead of complying with the policy requirements mentioned above, Defendant Covington

conducted a "body and card" count, where he walked the cells and ensured that a body was

present to account for each card. *Id.* at 32. Defendant Covington has no recollection of

interacting with Nallani between the time his shift started at 7 a.m. to the time Nallani was found

dead in his cell. *Id.* at 30.

Shortly after 10 a.m., Defendant Hammoud testified that he was approached by a social

worker who asked for Nallani.[2] (Ex. I to Pl.'s Resp. at 88, "Hammoud's Dep."). At this point in

time, the bars were open and the inmates were able to walk out of their cells. *Id.* at 84. After his

page for Nallani proved unsuccessful, Defendant Hammoud asked Inmate Yao to get Nallani. *Id.*

at 90. Yao returned and informed Hammoud that Nallani was not responding. *Id.* Defendant

Hammoud went to Nallani's cell. *Id.* Hammoud testified that he found Nallani "laying there on

his side with the blanket over his head like he was sleeping." *Id.* at 91. Defendant Hammoud

removed the blanket when Nallani failed to respond to his calls. *Id.* At this point, Defendant

Hammoud discovered that Nallani had a plastic bag tied tightly over his head. (Ex. I to Defs.'

Motion). Defendant Hammoud then alerted Defendant Covington to call a Code 2 while he

---

[2]The incident report Hammoud composed makes no mention of the social worker. Instead, it
states that Inmate Yao alerted Hammoud that something may be wrong with Nallani. Hammoud
testified that at the time he was making the report, he forgot to include it. Hammoud's Dep. at
115.

12

proceeded to remove the plastic bag and began administering CPR. *Id.* Resuscitation efforts continued until Dr. Thomas Clafton pronounced Nallani dead at 10:25 a.m. (Pl.'s Stmt. ¶ 21, Defs.' Stmt. ¶ 21). At the time he was discovered, Nallani was in full rigor. *Id.* at 22. According to Plaintiff's expert forensic pathologist, Nallani had been deceased for several hours and was "salvageable had he been found in time." (Ex. E to Pl.'s Resp.).

### C.    Jail Policy re: Suicide Prevention

An autopsy confirmed that the cause of death was asphyxia due to suffocation and the manner of death was suicide. (Pl.'s Stmt. ¶ 23, Defs.' Stmt. ¶ 23). Defendant Case testified that he has been involved in many suicide attempts on the 4th floor and that as a consequence of the heightened risk of suicide, his job responsibilities include being aware of suicidal behavior and stopping suicide attempts. (Case's Dep. at 7). While deputies are required to look for and identify suicidal behavior, Defendant Case testified that in the 10 years he has been assigned to that floor, he has received "very limited" formal training regarding mental health and suicide. *Id.* at 9-10. Defendant Hunter testified that he did not receive any additional training with respect to dealing with the inmates on the Mental Health Unit, but has engaged in computer training on suicide. ( Hunter's Dep. at 6-7, 72). Similarly, Defendant Hammoud received suicide training during his first jailer's training, but was not required to undergo any additional training on suicide prevention for the Mental Health Unit. (Hammoud's Dep. at 46-47).

All of the deputy Defendants testified that they were aware of WCJ's suicide policy, which required them to observe inmates for any sign of suicidal behavior. (Hammoud's Dep. at 85; Case's Dep. at 11; Covington's Dep. at 47; Hunter's Dep. at 71). Specifically, the Defendants acknowledged that withdrawn and isolated behaviors are symptoms they are trained

13

to be aware of.

### D.    Inmate Yao & Deputy Defendants' Observations of Nallani

During an investigation subsequent to Nallani's death, Inmate Yao informed Officer Dixon that in the last couple of days of his life, Nallani was "extremely quiet... more quiet than usual." (Dixon's Dep. at 16-17). There is no evidence, however, to suggest that Inmate Yao alerted anyone of Nallani's changed demeanor prior to his suicide.

Although it is the Defendants' admitted duty to be aware of Nallani's demeanor, none of them observed Nallani being any more quiet than he usually was. (Dixon's Dep. at 19). When asked, Defendant Hammoud denied observing withdrawn behavior. (Hammoud's Dep. at 143). Defendant Covington testified that he did not really know who Nallani was prior to his suicide and could not recall any of Nallani's behavior. (Covington's Dep. at 48). Defendant Case recalls Nallani being "quiet for the most part" and observed no change in his demeanor. (Case's Dep. at 14) *(see* also, Dixon's Dep. at 83).

The Defendants testified that on the night in question, they were not aware that Nallani posed any risk to himself. Nothing in the facts alerted the Defendants that something was amiss. Nallani appeared to be sleeping throughout the midnight shift. The record suggests that it was not unusual for an inmate to sleep with a blanket over his head during that shift. (Case's Dep. at 52). It is similarly not unusual for inmates on the Mental Health Unit to be found sleeping at 10 a.m. (Covington's Dep. at 68).

### E.    Deputy Defendants' Testimony re: Nallani's Medical History

Because Nallani was housed on the Mental Health Unit, the Defendants were aware that he suffered from some type of mental illness. (Dixon's Dep. at 18). However, in their capacity

14

as deputies, Defendants did not have access to Nallani's medical history.  Defendants Case,

Covington, Hammoud, and Hunter all testified that an inmate's medical information or diagnosis

is not made available to them unless the medical team determines that the inmate is suicidal.  In

fact, Defendants Hammoud and Covington similarly testified that even an inmate's prior history

of attempted suicide is not accessible unless the attempt occurred at the jail.  (Hammoud's Dep.

at 58-59; Covington's Dep. at 48).  Defendant Hammoud testified as to the following:

> **Q**: And you understand that when you're dealing with mental health patients, you've been trained that these mental health patients, that these inmates could potentially have suicidal ideations, you've heard of that?
>
> **A**: No. Once somebody – the only extra care that I would – well, I mean I would observe everything, you know, the best I could, but if the person wasn't on close observation for suicidal risks, if there was no note saying that "Hey, this guy could be a potential for suicide," it would be very hard for me to, you know, look for something like that.

(Hammoud's Dep. at 150).

### F.    Testimony re: Plastic Bag

Defendant Hunter testified that, prior to this incident, plastic bags like the one Nallani

used to kill himself were accessible to the inmates on the Mental Health Unit through the ward.

(Hunter's Dep. at 38-39).  Unless placed on continuous observation, inmates were free to walk

the ward during the day shift.  The bags were placed on the ward to collect trash the inmates

threw away. (Hammoud's Dep. at 60).  It was standard for jails to use plastic bags in this manner.

(Restum's Dep. at 33).

Officer Dixon testified that, prior to June 2013, officers were not required to remove

plastic bags from an inmate's cell unless that inmate was placed on continuous observation.  (Ex.

L to Pl.'s Resp. at 43, "Dixon's Dep.").  Covington testified that plastic bags in an inmate's cell

15

were considered contraband and would be removed if seen.  (Covington's Dep. at 37).  Hunter

similarly testified that plastic bags from the ward were not allowed in the cell.  (Hunter's Dep. at

79).  Defendant Hammoud acknowledged that it would be dangerous for a mental health inmate

to have possession of the ward's plastic bag and that it was part of a deputy's job to ensure that

the inmates did not take it.  (Ex. I to Pl.'s Resp. at 64).  Hammoud later clarified:

> **Q**:     You would agree that a plastic bag in possession of an inmate who has a mental
> illness could be dangerous?
>
> **A**:     No.
>
> **Q**:     Having a plastic bag in a cell by someone who's on antipsychotic medication is
> not a dangerous thing?
>
> . . . .
>
> **A**:     I'm sorry, it's the same thing as saying a blanket is dangerous. Anything could be
> considered dangerous, so I mean are we not allowed to give them blankets, are we
> not allowed to give them mats?
>
> **Q**:     Blankets and plastic bags are dangerous for inmates who are on antipsychotic
> medications and **have had previous suicide attempts**, correct?
>
> **A**:     Anything would be.

(Hammoud's Dep. 151-52) (emphasis added).  Restum testified that he would not want an inmate

with a *history of attempted suicide* to have access to plastic bags.  (Restum's Dep. at 40)

(emphasis added).  Regardless of whether or not inmates were allowed plastic bags in their cells,

the deputy Defendants have consistently testified that they did not see a plastic bag in Nallani's

cell.  The record does not contain any evidence to suggest that Defendants were made aware that

a plastic bag was missing from the ward or that Nallani had possession of the ward's bag.

Since June 2013, the trash bags on the ward have become regulated.  (Case's Dep. at 25).

The bags are pulled off the ward at the end of every shift and placed in a secure location, whether

full or not.  *Id.*  Officer Dixon testified that the new policy was implemented so that inmates will not use plastic bags to commit suicide.  (Dixon's Dep. at 41).

### G.        Testimony re: Suicides at Wayne County Jail

Hunter testified that he had never personally been involved in any suicide attempts on the Mental Health Unit floor, but he has been made aware of at least 10-15 attempted suicides on that floor since 2005.  (Hunter's Dep. at 68-69).  Of the 10-15 suicide attempts, none involved plastic bags.  *Id.*  Nallani's suicide is the first suicide-by-plastic-bag that Hunter has been aware of.  *Id.*

Hammoud testified that since the start of his employment in 2007, he has never known a trash bag to be utilized by an inmate to effectuate self-harm.  (Hammoud's Dep. at 144).  Nallani's suicide, to the best of his knowledge, would be the first incident in which a suicide was effectuated by plastic bag.  *Id.*

### III.    ANALYSIS

### A.        Standard That Governs Defendants' Motion

Defendants have brought their motion under both Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56.  Since matters outside of the pleadings have been considered, the Court will treat the motion as one seeking summary judgment.

Fed. R. Civ. P. 56 governs motions for summary judgment.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 325 (1986).  When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus*. Co. *v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of material parts in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).  "The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Perez*, 380 F.Supp. at 838 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  "The Court need only consider the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  Ultimately, a district court must determine whether the record presents a genuine issue of material fact.  *Id*.  The court may draw "all justifiable inferences in the light most favorable to the non-moving party."  *Hager v. Pike Cnty*. *Bd. of Ed*., 286 F.3d 366, 370 (6th Cir. 2002).

## B.    Qualified Immunity

Count I of Plaintiff's Second Amended Complaint, brought under § 1983, asserts that the Defendants were deliberately indifferent to Nallani's medical needs.  The Defendants assert that they are entitled to qualified immunity.

18

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law. *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary functions are generally shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549. Because Count I is asserted against all Defendants, "[e]ach defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

Addressing the first prong of qualified immunity, Plaintiff alleges violations of Nallani's constitutional right to adequate medical care as a pretrial detainee. Plaintiff asserts that the Defendants were deliberately indifferent to Nallani's serious medical needs in violation of the Eighth and Fourteenth Amendments. Specifically, Plaintiff maintains that the Defendants were deliberately indifferent to Nallani's risk of suicide.

The Eighth Amendment provides prisoners with a constitutional right to be free from cruel and unusual punishment. "As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs."

19

*Perez v. Oakland Cnty.*, 466 F.3d 416, 423 (6th Cir. 2006).  However, the Eighth Amendment will only prohibit mistreatment " '[w]here prison [or jail] officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain...' " *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).  "While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment."  *Gray v. City of Detroit*, 399 F.3d 612, 615-16 (6th Cir. 2005).  To comply with the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted).  The Sixth Circuit has held that a suicidal prisoner, who has been recognized as such, is entitled to continuing medical treatment.  *Comstock v. McCrary*, 273 F.3d 693, 273 (6th Cir. 2001).  The deliberate indifference standard consists of both an objective and subjective component.

The objective component is satisfied by showing that an inmate has a medical need that is objectively "sufficiently serious."  *Farmer*, 511 U.S. at 834 (internal quotations and citation omitted).  Essentially, there must have existed a "substantial risk of serious harm" to a detainee's health or safety.  *Farmer*, 511 U.S. at 834.  "Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise."  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004).

The subjective component requires a showing that the official being sued knew of and disregarded an "excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837.  In order to

20

satisfy the subjective component, "the plaintiff must allege facts which, if true, would show that

the official being sued subjectively perceived facts from which to infer substantial risk to the

prisoner, that he did in fact draw the inference and that he then disregarded that risk." *Comstock*

273 F.3d at 703. "This standard requires that the defendant's *mens rea* be higher than negligence

but lower than purposeful or knowing infliction of harm." *Linden v. Washtenaw Cnty.*, 167 F.

A'ppx 410, 416 (6th Cir. 2006). This Court has acknowledged that "the subjective prong of the

'deliberate indifference' standard is not easily met," since it requires evidence regarding what

officials actually knew or believed, and not just what they should have known. *Joseph v. City of*

*Detroit*, 289 F. Supp. 2d 863, 872 (E.D. Mich. 2003); *see also Comstock*, 273 F.3d at 703 ("An

official's failure to alleviate a significant risk that *he should have perceived but did not*... cannot

under our cases be condemned as the infliction of punishment." (quoting *Farmer*, 511 U.S. at

838) (emphasis in original)); *Estelle*, 429 U.S. at 105 ("[A]n inadvertent failure to provide

adequate medical care cannot be said to constitute" an Eighth Amendment violation.); *Watkins*,

273 F.3d at 686 ("If an officer fails to act in the face of an obvious risk of which he should have

known but did not, the officer has not violated the Eighth or Fourteenth Amendments."). With

that said, however, "'a prison official may not escape liability if the evidence showed that he

merely refused to verify underlying facts that he strongly suspected to be true or declined to

confirm inferences of risk that he strongly suspected to exist.'" *Comstock*, 273 F.3d at 703

(quoting *Farmer*, 511 U.S. at 843 n.8).

In the context of prisoner suicides, the appropriate inquiry for liability under § 1983 is

"whether the decedent showed a strong likelihood that he would attempt to take his own life in

such a manner that failure to take adequate precautions amounted to deliberate indifference to the

21

decedent's serious medical needs." *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir.
1992).

### 1.    Objective Component

As previously noted, a prisoner's "psychological needs may constitute serious medical
needs, especially when they result in suicidal tendencies." *Horn*, 22 F.3d at 660.  "Thus, a
plaintiff meets the objective component... by demonstrating that the inmate exhibited suicidal
tendencies during his or her detention or that he 'posed a strong likelihood of another suicide
attempt.' " *Grabow v. Cnty. of Macomb*, 580 F. A'ppx 300, 307 (2014) (quoting *Perez*, 466 F.3d
at 424).  The record shows that Nallani presented with a number of symptoms during his
detention, which testimony confirmed were factors to consider when assessing an inmate's risk
for suicide.  The following factors are most relevant: Nallani admitted he felt suicidal at the time
of his arrest; Nallani harmed himself when he was 10 years old; Nallani consistently complained
that he suffered from depression and ADHD; Nallani complained that he had trouble sleeping;
Nallani had a previous psychiatric history including outpatient therapy and prescriptions for
psychotropic medications; at one point, Nallani testified that he was hearing hallucinatory voices;
Nallani was diagnosed with major depressive disorder and anxiety disorder by Hatfield; Nallani
had paranoid thoughts regarding the FBI; and Nallani was diagnosed with mood disorder and
psychotic disorder by Witulski.  Plaintiff has therefore made a sufficient showing as to the
objective prong.

### 2.    Subjective Component

The Court's inquiry is not over with a finding that genuine issues of material fact exist as
to the objective element of Plaintiff's deliberate indifference claim.  Plaintiff must now show that

each individual defendant (1) "subjectively perceived facts from which to infer a substantial risk to" Nallani; (2) "did in fact draw the inference"; and (3) "disregarded that risk." *Galloway v. Anuszkiewicz*, 518 F. A'ppx 330, 333 (6th Cir. 2013). Knowledge of a substantial risk to an inmate can be established through circumstantial evidence and may be inferred from "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 826.

Plaintiff has not presented evidence that creates a question of fact as to this subjective component. For the reasons set forth below, the individual Defendants are entitled to qualified immunity with respect to Count I.

### Defendant Zuhairy

Plaintiff contends that Defendant Zuhairy exhibited deliberate indifference by failing to act despite having "reason to know" that Nallani posed a threat to himself. (Pl.'s Resp. at 9). Since Zuhairy was admittedly aware of the inconsistent information contained in Nallani's previous evaluations, Plaintiff argues that this information, coupled with Judge Whalen's observation that Nallani "clearly" needed mental health treatment, creates a genuine issue of material fact as to whether Zuhairy actually knew that Nallani required close observation or some other level of care he had not received. Plaintiff contends that Judge Whalen's observations establish that Nallani's medical emergency was "obvious," which is one way to demonstrate the existence of a question of material fact. (Pl.'s Resp. at 10-11). Plaintiff essentially argues that if Judge Whalen recognized the "obvious" need for mental health treatment and the potential of self-harm, then questions exist as to whether Zuhairy did too. Plaintiff also relies on the reports of its two expert witnesses to substantiate the claim that Zuhairy was deliberately indifferent to Nallani's needs. Dr. Larry Kirstein stated that Zuhairy failed to provide the necessary and

23

reasonable care that Mr. Nallani required and ignored his psychiatric condition and medical need.
The report concludes that Zuhairy "*failed to recognize* and treat [Nallani's] suicide symptoms,"
thereby violating the applicable standards of care.  (Kirstein's Report) (emphasis added).
Similarly, Plaintiff's Expert Thomas White, Ph.D., opined that Zuhairy failed to consider all of
the information in the record before her and thus, inadequately treated Nallani's medical health
conditions.  The report concludes that "Zuhairy was *negligent* in failing to properly assess Mr.
Nallani; and in doing so, *did not recognize* or adequately respond to his serious mental illness
and risk of suicide."  (White's Report) (emphasis added).

Initially, the Court notes that Judge Whalen's observations do not constitute
circumstantial evidence of the "obviousness" of Nallani's medical need.  It cannot be said that
Zuhairy must have been aware of Nallani's "obvious" risk of suicide simply because Judge
Whalen observed a risk of self-harm.  First, Plaintiff has not presented any evidence to establish
that Zuhairy was aware of the detention hearing or Judge Whalen's observations.  Second, Judge
Whalen's statements were based on his own observations of Nallani, on the record before him
and on the testimony he heard that day, including the testimony of Nallani's attorney.  There is
no evidence to establish that Zuhairy was aware of all the information that led Judge Whalen to
make his determination.  Finally, Zuhairy personally evaluated Nallani and, based on her
knowledge and training, she did not consider him suicidal and did not believe he needed to
placed under continuous observation.

With respect to Zuhairy's culpability under the subjective prong, it bears noting that
Zuhairy did not disregard Nallani's mental health needs altogether.  Thus, "[w]hen a prison
doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed

24

a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 at 703. Here, Zuhairy evaluated Nallani after he had been assessed by a number of mental health officials at the jail. Zuhairy's primary objective was to ascertain whether or not Nallani posed a threat to himself. In her report, Zuhairy noted that Nallani denied any current suicidal ideation, he denied buying a gun to harm himself, and he denied having thoughts of ever wanting to hurt himself. Zuhairy concluded that Nallani was psychiatrically stable. Like Hatfield and Witulski before her, Zuhairy also did not determine Nallani to be suicidal. Zuhairy made treatment recommendations based on her own observations. Zuhairy prescribed Nallani Zoloft for his stated depression and Trazadone for his insomnia and recommended that he be housed in general population with continued mental health follow-ups.

Because Zuhairy did not wholly disregard Nallani's needs, Plaintiff must do more than assert negligent or ineffective treatment to succeed on her Eighth Amendment claim. It is true that Zuhairy testified that the inconsistencies and differences between Nallani's evaluations were concerning and admitted that she failed to investigate them further. Be that as it may, Zuhairy's failure to investigate does not amount to deliberate indifference. Again, the record shows that Zuhairy conducted her own evaluation of Nallani where Nallani's symptoms were weighed against other risk factors for suicide. At most, Plaintiff's evidence could possibly support a finding that Zuhairy was negligent. It is telling that even Plaintiff's own experts did not conclude that Zuhairy recognized and disregarded Nallani's risk of suicide. Rather, their reports conclude that Zuhairy "**failed to**" or "**did not**" recognize Nallani's risk. Because Plaintiff's evidence merely suggests negligence on Zuhairy's part, the deliberate indifference claim fails. *See Estelle*,

25

429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

The Sixth Circuit has affirmed summary judgment rulings in favor of psychiatrists who were far more negligent than Zuhairy. The psychiatrist in *Linden* was entitled to summary judgment despite his decision to remove an inmate from suicide precautions. *Linden*, 167 F. A'ppx at 421-22. That decision was made after the inmate exhibited "overt" signs of suicide risk, including "feeling[s] of hopelessness, helplessness, and worthlessness." *Id.* at 421. The court concluded that, "[w]hile [the defendant's] potentially negligent behavior in retrospect seems appalling, it does not establish deliberate indifference since 'inadvertent failure to provide adequate medical care cannot be said to constitute' a constitutional violation." *Linden*, 167 F. A'ppx at 421-22 (citing *Estelle* 429 U.S. at 105). Here, Nallani exhibited no such signs. Nallani had never attempted suicide before. Nallani was not placed on suicide watch and then taken off of it. Nallani was seen by four different mental health professionals and was never determined to be suicidal at any point during his detention at WCJ. Under the evidence presented here, Zuhairy was not deliberately indifferent to Nallani's psychological needs and is therefore entitled to qualified immunity.

### Deputy Defendants

Plaintiff argues that evidence exists to suggest that Plaintiff's risk of suicide was so obvious that a reasonable jury could find that the Defendants possessed a greater knowledge than they admit. Plaintiff's claim relies on the following: (1) Nallani's demeanor underwent change, as perceived by Inmate Yao, in that Nallani became more quiet than usual; (2) Defendants are

26

aware that changes in behavior (becoming detached, withdrawn, isolated), are precursors to suicide; (3) Defendants admit that their job requires them to look for signs of suicide; (4) Defendants are aware of the risk of inmate suicide on the Mental Health Unit; and (5) in the short time Nallani stood before Judge Whalen, he was able to conclude that it was clear Nallani was in need of mental health treatment. Plaintiff additionally argues that there can be no justification for allowing an inmate, suspected to be a suicide risk, possession of a plastic bag.

In order to satisfy the first prong of the subjectivity test in the context of jail suicide cases, the Sixth Circuit has required facts that show how the jail official was alerted to the inmate's suicide risk. *See Perez*, 466 F.3d at 425 ("Throughout her time treating [the inmate], [the jail official] made the decision, on several occasions (most recently a month before he committed suicide), to place [the inmate] on an elevated watch status and to house [the inmate] in an observation cell or with roommate(s)."); *Cooper v. Cnty. Of Washtenaw*, 222 F. A'ppx 459, 469 (6th Cir. 2007) (reasoning that the fact that the jail official was present at the inmate's court hearing where the judge ordered the inmate be put on suicide watch, along with the official's ability to see the inmate housed in an observational cell, both support the notion that the official had at least perceived enough facts to give rise to the inference that the inmate would commit suicide). Here, the record does not contain similar facts. Plaintiff has not produced evidence that creates any question as to whether or not any individual Defendant *actually* and *subjectively* perceived facts from which to infer a substantial risk that Nallani would commit suicide, that they actually made the inference, and that they disregarded it. That the Defendants *should have* noticed Nallani's suicidal tendencies is insufficient under this prong.

27

The Court will address Nallani's possession of the ward's plastic bag first.  The evidence as to the deputy Defendants' subjective knowledge of the risk the ward's plastic bag posed to Nallani consists of: (1) the deputy Defendants were aware that plastic bags were accessible to the inmates on the MHU through the ward; and (2) testimony that plastic bags in the possession of inmates with history of suicide attempts could be dangerous.

Initially, it should be noted that Plaintiff premises her argument on the assumption that Nallani was suspected to be a suicide risk.  There is no evidence that any of the deputies suspected that Nallani would commit suicide.[3]

Additionally, this is not a case where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, [nor in which] the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it…"  *Farmer*, 511 U.S. at 842.  Instead, the evidence here shows that: (1) none of the deputy Defendants subjectively perceived Nallani to be a suicide risk; (2) no inmate had previously tried to commit suicide by using a plastic bag; (3) that it was standard to use plastic bags for inmate trash on the ward; and (4) after Nallani's suicide, WCJ changed its policy so as to prevent inmates from using the ward's plastic bags to commit suicide.

Even if the Defendants perceived facts from which to infer that the bags posed a risk to Nallani, there is no evidence that any of the Defendants actually made the inference and disregarded it.  Instead, the evidence shows that: (1) the Defendants were not made aware that a bag from the ward was missing; (2) the Defendants did not observe the ward's plastic bag in Nallani's cell and had they seen it, the bag would have been removed; and (3) it was not unusual

---

[3] This is discussed in detail under the analysis of each individual defendant.

for Nallani to appear sleeping with a blanket over his head during the time period at issue.

Plaintiff has failed to present evidence to establish that the deputy Defendants were subjectively aware of Nallani's possession of the ward's plastic bag or the risk it posed to him.

Below is a discussion of the individual Defendants' culpability with respect to Plaintiff's claim that each deputy was deliberate indifferent to Nallani's risk of suicide, since "[e]ach defendant's liability must be assessed individually based on his [or her] own actions." *Binay,* 601 F.3d at 650.

### Defendant Case

Plaintiff has failed to present evidence to establish that Defendant Case, a Deputy Officer, subjectively perceived facts from which to infer that Nallani may commit suicide.  On the night before Nallani's suicide, Case conducted the midnight shift's card count.   The evidence shows that case observed Nallani sitting up in his bunk with a blanket covering him from the shoulders down.  Nallani raised his hand from underneath the blanket when Case called out his name.  For Case's remaining security rounds, he observed Nallani to be sleeping.  Nallani was laying down and facing the wall with a blanket over him.  Additionally, nothing in the record suggests that Case was aware of Nallani's possession of the ward's plastic bag.  Case testified that it was common for inmates to sleep with blankets over their heads during the midnight shift so as to not wake up from the deputies' flashlights.

Although Case was aware that depression and withdrawn/isolated behavior were risk factors for suicide, the record does not suggest that he subjectively perceived Nallani exhibiting any of these symptoms.  With respect to Inmate Yao's testimony, Case testified that he had always perceived Nallani as quiet and that he didn't notice anything wrong with him in the days

29

leading to his suicide.  The fact that Yao observed Nallani become more quiet than usual two days before his suicide cannot be imputed to Case.  Moreover, a quiet inmate becoming quieter is not a sufficient fact from which Case could perceive that Nallani would commit suicide.  Nor does the record suggest that Case actually drew the inference and disregarded the risk.

Additionally, a reasonable juror could not conclude that Case was subjectively aware of Nallani's risk of suicide simply because Nallani was housed on the Mental Health Unit. Although Case was aware of the risk of inmate suicide on the Mental Health Unit, this on its own is not enough to charge Case with subjective knowledge of Nallani's risk.  The evidence establishes that Case did not have access to Nallani's medical records.  Nallani could have been placed on the Mental Health Unit for a variety of reasons – many of which are unrelated to risk of suicide.

Plaintiff's argument that Case must have known Nallani was suicidal since Judge Whalen was able to determine that Nallani needed mental health treatment in the short time that Nallani stood before him is not persuasive.  The information Judge Whalen based his opinion on was not made available to Case.  There is no evidence that Case was aware of Nallani's detention hearing or Judge Whalen's observations therein.

Ultimately, the circumstantial evidence presented by Plaintiff does not create an issue of material fact as to what Case actually knew.  In light of these facts, Case was not deliberately indifferent and is entitled to qualified immunity.

### Defendant Covington

Plaintiff has failed to establish that Defendant Covington subjectively perceived facts from which to infer that Nallani would commit suicide, and that he made the inference and then

disregarded the risk.  Defendant Covington conducted the card count at 7 a.m. on June 11, approximately 3 hours before Nallani was discovered dead.  Covington's card count was conducted in violation of WCJ's policy.  Covington did not call out Nallani's name and he did not elicit any sort of response from Nallani.  Instead, Covington conducted a "body and card" count.  However, Covington's policy violations do not amount to deliberate indifference.  There is no evidence in the record that Covington was aware of Nallani's possession of the ward's plastic bag.  Because it is not unusual for inmates to be sleeping at 7 a.m. and because nothing seemed amiss with Nallani at that time, there would have been no basis for Covington to perceive that Nallani faced a substantial risk of committing suicide if he conducted a "body and card" count that morning rather than elicit a response from Nallani.

Plaintiff has also failed to establish that Covington actually perceived facts from which he could infer that Nallani was at a substantial risk for committing suicide.  As with Defendant Case, it is not enough that Covington was aware that depression and withdrawn behavior were signs of suicide.  There is no evidence to suggest that Covington actually perceived Nallani exhibiting these symptoms.  Covington testified that he did not really know who Nallani was and he did not recall any of Nallani's behavior while housed on the Mental Health Unit.  Again, the fact that Inmate Yao observed a quiet inmate become quieter in the two days before his suicide is not sufficient circumstantial evidence to show that Covington inferred that Nallani would commit suicide.

As with Defendant Case, Judge Whalen's observations are also not enough to establish that Nallani's suicide risk was obvious.  The record shows that Covington was not aware of Nallani's detention hearing.  Finally, Nallani's mere presence on the Mental Health Unit is also

31

not enough to show that Covington had subjective knowledge of Nallani's risk of suicide. The record makes clear that Covington did not have access to Nallani's medical file. Unless the mental health team placed Nallani under close observation for being a suicide risk, Covington could not have known why Nallani was housed on the Mental Health Unit. In light of these facts, a reasonable fact-finder could not conclude that Covington was deliberately indifferent to Nallani's risk of suicide and he is therefore entitled to qualified immunity.

### Defendant Hammoud

Plaintiff has also failed to establish that Defendant Hammoud, a Deputy Officer, subjectively perceived facts from which to infer that Nallani would commit suicide. Hammoud discovered Nallani dead in his cell with a bag over his head after Nallani failed to respond to Hammoud's pages. Hammoud administered CPR until medical personnel arrived. Like Case and Covington, Hammoud was also unaware of Nallani's possession of the ward's plastic bag. Hammoud testified that Nallani appeared to be sleeping and that it was not strange for an inmate to be sleeping during this time.

Again, like the deputy Defendants above, it cannot be shown that Hammoud perceived facts from which to infer that Nallani would commit suicide. Although Hammoud was aware that withdrawn behavior is a suicide risk factor, the evidence does not suggest that Hammoud perceived such behavior from Nallani. For the reasons stated above, Inmate Yao's testimony does not call into question what Hammoud actually perceived. Judge Whalen's observations also do not call into question what Hammoud actually perceived. Hammoud was never informed of Nallani's detention hearing and he was not made aware of the information that was before Judge Whalen at the time his observations were made. Finally, Nallani's placement on the Mental

32

Health Unit is not enough to show that Hammoud had subjective knowledge of Nallani's risk of suicide. Hammoud did not have access to Nallani's medical history. In light of these facts, Defendant Hammoud was not deliberately indifferent to Nallani's risk of suicide and is entitled to qualified immunity.

**Defendant Hunter**

Plaintiff has also failed to present evidence to establish a showing that Defendant Hunter, a Deputy Officer, subjectively perceived facts from which to infer that Nallani would commit suicide. Hunter worked the midnight shift with Defendant Case on the night before Nallani was discovered dead.

Like the other deputy Defendants, Hunter was aware of behaviors to watch for such as isolation, depression and giving away property. There is no evidence to suggest that Hunter subjectively perceived Nallani exhibit this type of behavior. Again as with the Defendants above, Inmate Yao's observations cannot be used as circumstantial evidence of the obviousness of Nallani's condition. Similarly, Judge Whalen's observations of Nallani do not create a question of fact as to whether or not Hunter was aware that Nallani was at risk for suicide. Finally, that Nallani was housed on the Mental Health Unit is not a fact from which Hunter could infer that Nallani may commit suicide**.**

**Defendant Napoleon**

With respect to Plaintiff's claims against Napoleon in his individual capacity, Plaintiff has failed to offer any facts from which Defendant Napoleon could have inferred that Nallani would commit suicide. The only allegation made against Napoleon can be found in Plaintiff's complaint, which asserts that he was the Sheriff and policy maker for the Wayne County Jail, that

he oversaw policy, practices, regulations, protocols and customs and that he had the authority to hire, screen, train supervise and discipline the deputies, corrections officers and medical staff. The Sixth Circuit has held that "§1983 liability must be based on more than respondeat superior, or the right to control employees." *Comstock*, 273 F.3d at 712-13. Thus, Napoleon cannot be held personally liable for failing to supervise the defendants unless there exists evidence of Napoleon himself engaging in " 'active unconstitutional behavior' by directly participating, encouraging, authorizing, or acquiescing in the allegedly offending conduct of a sheriff's deputy." *Perez*, 380 F.Supp. at 848 (quoting *Doe v. City of Roseville*, 296 F.3d 431, 439-40 (6th Cir. 2001).

For these reasons, the Court grants summary judgment in favor of Napoleon as to the claims asserted against him in his individual capacity and dismisses Plaintiff's § 1983 claim.

### C.    Plaintiff's § 1983 Claim Against Defendants Wayne County & Benny Napoleon

Count II seeks to establish municipal liability against Wayne County and liability against Napoleon in his official capacity, under a failure-to-train theory, for the alleged Constitutional violations committed by the Zuhairy and the deputy Defendants. Plaintiff's official capacity claim against Napoleon is essentially a claim against Wayne County. Given that this Court is dismissing all constitutional claims against the individual Defendants, Plaintiff cannot rely on their conduct to establish a claim of municipal liability against Wayne County or an official capacity claim against Napoleon and Count II must be dismissed.

Plaintiff argues that the Sixth Circuit in *Baker v. Union Twp.*, 587 F. A'ppx 229 (6th Cir. 2014) concluded that a municipality could be held liable for a constitutional violation at trial even after its individual employee was dismissed from the case upon a finding of qualified

34

immunity.   Plaintiff's argument is misplaced since *Baker* is distinguishable here.   In *Baker*, the court's conclusion rested on the fact that the underlying misconduct amounted to a constitutional violation under the qualified immunity analysis.   The court explained that liability will attach in a situation where the "district court [finds] that the [municipality] ratified [employee's] misconduct which, though unconstitutional, was not in violation of clearly established law."   Here, the alleged misconduct of the individual Defendants *does not amount to a constitutional violation* because the Defendants did not exhibit deliberate indifference.

Because the individual Defendants were not deliberately indifferent, their conduct did not amount to a constitutional violation.   "Under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality may be liable to a plaintiff under § 1983 if the plaintiff demonstrates that a constitutional violation occurred *and* that it was the result of a "policy or custom" of the municipality. "   *Cleary v. County of Macomb*, 409 F. App'x 890, 906 (6th Cir. 2011) (emphasis added).   Thus, "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983."   *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001);  *Voyticky v. Village of Timberlake, Ohio,* 412 F.3d 669, 679 (2005) (For municipal liability to exist, "a constitutional violation must take place.").   Accordingly, the Court shall dismiss Count II as to both Wayne County and Defendant Napoleon.

### D.     Plaintiff's Gross Negligence, Intentional, Willful, and Wanton Conduct

Count III asserts a state law claim against the County and against each Defendant.

#### 1.     The County

Under Michigan's Tort Liability Act, governmental agencies are "immune from tort

35

liability in all cases wherein the governmental agency is engaged in the exercise or discharge of a governmental function."  Mich. Comp. Laws § 691.1407(1).

Here, Plaintiff seeks to invoke an exception to governmental immunity under Mich. Comp. Laws § 691.1407(4).  The section states:

> This act does not grant immunity to a governmental agency or an employee or agent of a governmental agency with respect to providing medical care or treatment to **a patient**, except medical care or treatment provide to a patient in a **hospital** owned or operated by the department of community health or a **hospital** owned or operated by the department of corrections and except care or treatment provided by an uncompensated search and rescue operation medical assistant or tactical operation medical assistant.

(emphasis added).

Plaintiff's attempt to circumvent governmental immunity through this exception fails. For starters, Nallani was not a "patient" as the statute clearly requires.  He was an inmate at the jail.  Second, Nallani was not housed or treated at a "hospital."  And finally, the deputy Defendants at the Wayne County jail do not provide medical care or treatment to the inmates. Under these facts, the exception does not apply.

### 2.      The Individual Defendants

Under Michigan law, governmental employees acting on behalf of a governmental agency are immune from tort liability if "(1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial , in nature."  *Odom v. Wayne Cnty.*, 482 Mich. 459, 461 (2008).  A governmental employee is not liable for personal injuries sounding in tort provided the employee's "conduct does not amount to gross negligence that is the proximate cause of the

injury or damage." Mich. Comp. Laws § 1407(2)(c). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* at § 691.1407(7)(a).

"This definition of gross negligence under Michigan law establishes a standard materially indistinguishable, as applied to the facts of this case, from the deliberate indifference standard discussed above in connection with plaintiff's § 1983 claims." *Soles v. Ingham Cnty.*, 316 F. Supp. 2d 536, 545 (2004) (citing *Farmer*, 511 U.S. at 836-38, discussing the relationship between recklessness and deliberate indifference.)) For the same reasons that Plaintiff has failed to establish deliberate indifference, Plaintiff has failed to establish any evidence to suggest that any of the Defendants exhibited conduct so reckless as to demonstrate a substantial lack of concern for whether Nallani would commit suicide.

Moreover, with respect to Zuhairy, even if the Court were to assume that Zuhairy exhibited gross negligence, it cannot be said that Zuhairy's treatment of Nallani was the proximate cause of his suicide. "An employee's conduct is 'the proximate cause' of an injury if it is 'the one most immediate, efficient, and direct cause preceding an injury." *Bennet v. Krakowski*, 671 F.3d 553, 560 (6th Cir. 2011) (citing *Robinson v. City of Detroit*, 462 Mich. 439 (2000)). Here, Nallani committed suicide in his cell by means of a plastic bag, which he took from the ward of the Mental Health Unit days after Zuhairy's evaluation. Thus, even if Zuhairy could be deemed grossly negligent for failing to place Nallani under close observation, this decision was not the proximate cause of Nallani's death. Instead, Nallani's "own volitional self-destructive act" was the proximate and most immediate cause of his death. *See Soles*, 316 F. Supp. 2d at 546 (holding that "even if [the defendants] were deemed responsible for some

37

nonfeasance amounting to gross negligence, liability could be imposed only if such nonfeasance was the proximate cause of [the imate's] death.  Yet, it is undisputed that [the inmate] committed suicide while he was alone in his cell by hanging himself with a bed sheet.  The one most immediate, efficient and direct cause of his death was clearly not any nonfeasance by defendants, but [the inmate's] own volitional self-destructive act.").

  With respect to the deputy Defendants, Plaintiff has failed to establish that any of the Defendants acted in a grossly negligent manner.  Plaintiff argues that the Defendants failed to ensure that Nallani was properly observed while in custody and failed to ensure that he was denied access to instrumentalities to commit suicide when he was known to be suicidal, known to suffer from hallucinations, and known to be depressed.

  First, Covington is arguably the only defendant that improperly monitored Nallani, since his card count was allegedly conducted against policy requirements.  However, Covington's policy violations do not amount to gross negligence.  Covington reasonably observed Nallani to be asleep at 7 a.m. on the morning he conducted his card count.  Rather than elicit a response from inmates he observed to be safe and sleeping, Covington conducted a "body and card" check, where he ensured that there was a body to account for each card in the accompanying cells.  Covington's card round, although improper, is not evidence of conduct so reckless as to demonstrate a substantial lack of concern for whether Nallani would commit suicide.

  With respect to the remaining deputy Defendants, there is no evidence to suggest that any of them improperly monitored Nallani.  The facts indicate that the Defendants conducted their rounds every half hour per policy requirements.  During their security rounds, the Defendants observed Nallani to be sleeping, something which was not unusual given that the rounds were

38

being conducted through the night and early morning.  The evidence also shows that it was not uncommon for inmates to sleep with blankets over their heads so as to not wake up from the flashlights used by the deputies during their rounds.  Failing to enter Nallani's cell to ensure that he was breathing when he appeared to be sleeping through the night does not amount to conduct so reckless as to demonstrate a substantial lack of concern for whether Nallani would commit suicide.

Second, the evidence fails to show that the deputy Defendants were aware that Nallani was suicidal, suffering from hallucinations and suffering from depression.  Instead, the unrefuted record shows that the deputy Defendants did not have access to Nallani's medical record and could not have known Nallani's diagnosis or reason for being on the Mental Health Unit.  So, even though there has been testimony to the effect that plastic bags in the possession of inmates with a history of suicide attempts poses a danger to the inmate's safety, the deputy Defendants could not have known Nallani's mental health history.  Additionally, there is nothing in the record that affirms the fact that Nallani had a history of suicide attempts.  Nallani has one reported incident of self-harm when he was 10 years old.  However, the details of the incident are unknown.  Further, nothing in the record suggests that Defendants knew that the ward's plastic bag was missing.  The deputy Defendants all testified that they would have removed the plastic bag from Nallani's possession had they seen it.  Thus, the deputy Defendants cannot be said to have acted so recklessly as to demonstrate a substantial lack of concern for whether Nallani would commit suicide by plastic bag.

In addition, the deputy Defendants' nonfeasance was not the proximate, most immediate cause of Nallani's death.  Instead, Nallani's own volitional act was the most immediate and

proximate cause of death. *See Cooper v. Washtenaw County*, 270 Mich. App. 506, 509-511 (2006) (the court held that the police officers were immune from liability because the inmate's act of committing suicide was the most immediate and direct cause of his own injury).

For the above reasons, Plaintiff has failed to present facts in avoidance of governmental immunity sufficient to create a triable issue of fact and Plaintiff's Count III is dismissed.

### CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's claims against Defendants shall be dismissed.

IT IS SO ORDERED.


S/Sean F. Cox_____
Sean F. Cox
United States District Judge


Dated: November 6, 2015.

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 6, 2015, by electronic and/or ordinary mail.


S/Kelly Winslow for Jennifer McCoy
Case Manager Generalist